Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALAN R. and J. R., <br><br> Plaintiffs, <br><br> vs. <br><br> AETNA LIFE INSURANCE COMPANY, and BANK OF AMERICA GROUP BENEFITS PROGRAM, <br><br> Defendants. | COMPLAINT <br><br> Civil No. 2:20-cv-00288 <br><br> Judge Campbell |

Alan R. ("Alan") and J.R. ("J."), through their undersigned counsel, complain and allege against Defendants Aetna Life Insurance Company ("Aetna") and Bank of America Group Benefits Program ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Alan and J. are natural persons residing in Nassau County, New York. Alan is J.'s father.

2. Aetna is an insurance company doing business in the State of Utah and throughout the United States. Aetna was the claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Alan was a participant in the Plan and J. was a beneficiary of the Plan under Alan's coverage through March 31, 2018. As of April 1, 2018, J. was covered by the Plan under COBRA.

4. J. received medical care and treatment at Fulshear Ranch ("Fulshear") and Fulshear to Transition ("FTT") from March 12, 2018 to November 30, 2018. Fulshear is a licensed residential treatment facility located in Texas, which provides sub-acute inpatient treatment to young adult women with mental health, behavioral, and/or substance abuse problems. FTT is a transitional living program which assists patients as they move to more independent living while still maintaining a robust therapeutic program to support them.

5. Aetna, acting as agent for the Plan, initially approved coverage for the first ten days of J.'s treatment in March of 2018, but then denied payment of J.'s medical treatment after that. Aetna then overturned the denial for dates of treatment from April 1, 2018, through August 1, 2018, following a successful appeal. However, Aetna's payments for the medical care at Fulshear during that timeframe were inconsistent with the terms of the Plan and the Department of Labor guidelines. Further, Aetna denied payment for J.'s treatment at FTT from August 2, 2018, through November 30, 2018.

6. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Alan for the medical expenses he incurred and paid for J.'s treatment and for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA").

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Aetna does business in Utah, and the treatment at issue took place in Texas. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under MHPAEA, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### J.'s Developmental History and Medical Background

10. J. has a significant family history of mental health disorders in her immediate and extended family.

11. J. was verbally advanced and was creative in her early childhood. She did well socially and academically. She was extremely sensitive however and presented a number of fears, she was often anxious and had various behavioral issues.

12. At around 4th grade, however, J. began experiencing more intense social anxiety and rejection sensitivity. She also began exhibiting obsessive compulsive behaviors which largely resolved after about six months following treatment with medication. However, J.'s emerging emotional problems led to rejection and ostracization from peers, which deeply traumatized her and led to further emotional challenges in the years ahead.

13. J. has consistently received psychiatric treatment since the age of 10.

14. J. continued to do well academically throughout middle and high school, although she was not motivated and did not enjoy school and began to refuse to attend. J. was transferred to an alternative school however she was alienated and insecure and did not have many friends. J. developed binging and purging behaviors and engaged in self-harm behavior (cutting) for a period of time.

15. J.'s college years were also very challenging, again due to her emotional and social issues. She felt isolated and friendless and kept leaving colleges for social, not academic reasons. In the years since high school, J. attended nine different colleges and only accumulated about 45 credits which were almost entirely from online courses. Consequently J. was never able to finish her education.

16. When she was 19, J.'s boyfriend ended their relationship of six months and J. was so distraught, she left college and was admitted to McLean Hospital in Boston. She was treated in a special unit for individuals with borderline personality disorder for about two months. While helpful, this program was not long enough to change J.'s dysfunctional behaviors.

17. When she was discharged from the hospital, she went into a residential group setting for an additional few months and then attended a day treatment program. However, this program was not helpful, and she was resistant to being told what to do and would refuse to get out of bed or participate in activities.

18. J. tried to attend college with little success and moved back home with her parents to attend another day treatment program. Although she said she didn't find the program particularly helpful, she was in that program until she was 21 years old.

19. J. again attempted college and independent living. However, she spent all her money on drugs and alcohol. Her parents and therapist recommended Alcoholics Anonymous and J. continues to participate in that program to the present although she has relapsed occasionally.

20. J. then moved to California on the condition that, in order to receive continued financial support from her parents, she live in a supervised setting at a sober living house. She enrolled in an intensive outpatient program with a residential component. Again J. did not find this program to be particularly helpful, so she attempted several different treatment programs. J. became frustrated that she was not able to find the help that she needed.

21. J. returned to New York to live with her parents. She has tried many different medications for her mental health conditions but has experienced significant side effects with almost all of the medications. J. tried working in several jobs but was fired from all of them. J. was becoming increasingly depressed and increasingly turned to drugs.

22. J. participated in multi-day psychological testing in April and May of 2017. She was diagnosed with:

>   F34.1 Persistent Depressive Disorder
>   F88 Other Specified Neurodevelopmental Disorder with autism spectrum traits, visuo-motor dysfunction and multiple obsessive-compulsive related disorders
>   F60-3 Borderline Personality Disorder
>   F60.7 Dependent Personality Disorder
>   F60.6 Avoidant Personality Disorder
>   F42 Obsessive Compulsive Disorder
>   F45.22 Body Dysmorphic Disorder
>   F63.2 Trichotillomania[1]
>   L98.1 Excoriation (Skin Picking) Disorder
>   F12.10 Cannabis Use Disorder, Mild
>   F50.8 Other Specified Eating Disorder, Bulimia Nervosa of Low Frequency

---

[1] Recurring and persistent urge to pull hair from the scalp

23. As a result of the testing results, extensive therapy was recommended for J., ideally in the least restrictive environment possible. However, after almost a year of failure of outpatient treatment and attempts to live independently, as well as J.'s deteriorating mental health, a residential treatment program was recommended by her psychiatrist.

24. J. was admitted to Fulshear on March 12, 2018. A psychosocial assessment was completed at that time and a Master Treatment Plan ("MPT") was created specifically for J. to address her difficulties.

25. One of J.'s outpatient psychiatrists worked closely with the team at Fulshear and stated that he believed J. was psychotic. He stated that he believed J. suffered from severe Borderline Personality Disorder as well as a non-verbal learning disability which made any attempt at treatment more complex and difficult. He opined that J. had a distorted sense of reality which made it difficult for her to engage with other people.

26. J. participated in individual, group, family, and milieu therapies at Fulshear and completed her residential treatment on July 31, 2018.

27. J. moved to an apartment for the FTT program where she continued to receive treatment until November 30, 2018.

## THE APPEALS

### Fulshear

28. Claims were submitted to Aetna for coverage of J.'s treatment and on March 23, 2018, Aetna wrote to Fulshear and denied coverage after March 22, 2018, based on Aetna's assertion that J.'s conditions did not meet its Level of Care Assessment Tool ("LOCAT") for residential treatment.

29. Alan appealed the denial in a letter dated September 14, 2018. First, he discussed the obligations of the Plan and Aetna to comply with ERISA and provide him with a full and fair review of the claim, taking into consideration all materials and information he provided to them. He asked that he be provided with the identity and credentials of any clinical reviewer(s).

30. Alan provided a detailed record of J.'s long history of problems and failed treatment. Alan included with his appeal letters from J.'s treating therapists in support of her residential treatment.

31. Alan asked that, in the event Aetna upheld the denial, it provide him with specific information about why it had approved the first ten days of J.'s treatment and then suddenly decided that she did not require additional residential treatment. Alan discussed the terms of the Plan and the requirements of LOCAT and argued that J. clearly continued to meet the guidelines for residential treatment.

32. On January 14, 2019, Alan also requested an external review of Aetna's denial and included all of the information and medical records he had submitted to Aetna. The reviewing entity, Medical Review Institute of America ("MRIoA") upheld Aetna's denial.

33. However, on March 29, 2019, Aetna wrote that it had overturned its denial of coverage at Fulshear through August 1, 2018. Aetna stated that the claims would be paid "according to the provisions of the medical benefit plan" and would take into consideration any copayments, deductibles, or coinsurance which Alan would be responsible to pay.

34. On August 13, 2019, following Aetna's payments to Fulshear, Alan wrote to dispute how the claims had been processed and paid. According to the Explanations of Benefits

("EOBs") Alan had received from Aetna, the claims had been paid based on what Aetna believed were "recognized or reasonable charges" for the services J. had received.

35. However, the rates of reimbursement were not consistent from month to month. For the April, 2018 treatment, Aetna paid the claims at 38%; for May services, Aetna paid 50% of the billed charges; June claims were paid at 22.50%; and July claims were again paid at 50%.

36. Alan referred Aetna to the Plan definition of "Reasonable and customary fee," which is, at least in part, determined by looking at other similar charges in the same geographical area where the charges were incurred. Alan noted that nothing in the Plan language indicated a calculation of a particular percentage of the billed charges.

37. Alan also included with his letter a notice from the U.S. Department of Labor which entitled him to receive the instrument under which Aetna determined what the reasonable and customary charges were for J.'s treatment.

38. Aetna responded on October 17, 2019, and stated that the coverage for April was based on Aetna's determination of reasonable and customary charges for the treatment at issue. The May claims had been paid at 50% of the billed charge based on provisions of the Plan that call for 50% reimbursement of out-of-network care. June claims had been paid under the reasonable and customary calculation but had been reduced for failure to pre-certify the treatment. Finally, the July charges had been paid at 50% pursuant to the coverage provisions of the Plan.

39. Aetna asserted that it calculated the reasonable and customary charges based on information submitted by health care providers to government agencies. If that information was not available, Aetna based its calculations on state averages. Aetna went

8
Case 3:20-cv-00441-RJC-DSC   Document 2   Filed 04/30/20   Page 8 of 17

on to say that it defined "reasonable" charges as "allow[ing] the facility to cover its expenses and [make] a reasonable margin or profit." Aetna did not include any documentation other than its standard notice regarding available appeal rights.

**FTT**

40. Alan appealed the denial of coverage for J.'s transition treatment on March 1, 2019. He referred to a number of EOBs he had received from Aetna for the FTT services. One, for services in August and September, stated: "This amount is denied. A portion of this inpatient stay was not necessary. We reduced our payment to reflect the days we authorized. You owe this amount."

41. A subsequent EOB for services in October and November said: "Your benefits were paid at a reduced rate. You did not meet your plan's precertification timeframe for your stay."

42. Alan argued that both EOB reasons for denial were erroneous. He argued that Aetna had already authorized J's admission in that it had paid through the end of August and she was continuing in the same program.

43. He then discussed his concerns about possible violations of ERISA. Specifically, he said any requirement to precertify ongoing treatment was an indication that Aetna did not understand the nature of the treatment J. was receiving. He also alleged that Aetna had not complied with ERISA because the individual who had reviewed the claim was not a board certified, actively practicing psychiatrist with expertise in J.'s conditions.

44. Alan then went on to discuss J.'s background and mental health conditions and cited to the therapy notes from FTT to support his argument that all of her transitional care was medically necessary and should be covered. He referred to the Plan's definition of

medical necessity and asserted that the Plan language supported coverage of the FTT treatment.

45. Finally, Alan asked that, in the event Aetna maintained its denial, he be provided with the criteria utilized by Aetna to evaluate intermediate care for both mental health and medical care, a copy of any administrative services agreements in place between Aetna and the Plan, the identity and credentials of Aetna's reviewers, and any reports compiled by the reviewers.

46. On April 30, 2019, Aetna responded to Alan's appeal and maintained its denial because during the treatment at FTT, J. "denied suicidal and homicidal ideation, did not evidence psychotic thought processing, nor exhibit mania or severe incapacitating depression, and she was not violent or otherwise aggressive towards others and destructive of property."

47. Aetna did not include any of the documents or information Alan had requested.

48. On August 13, 2019, Alan requested an external review and provided all of the information he had submitted to Aetna for the reviewer's reference.

49. On October 3, 2019, the reviewing entity, Medical Expert Consulting Services, upheld Aetna's denial.

50. A letter from Aetna dated October 4, 2019, confirmed the decision of the external review.

51. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

52. The denial of benefits for J.'s treatment was a breach of contract and caused Alan to incur medical expenses that should have been paid by the Plan in an amount totaling over $115,000.

53. Aetna failed to provide any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of Alan's request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

54. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

55. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

56. The denial letters produced by Aetna do little to elucidate whether it conducted a meaningful analysis of Alan's appeals or whether it provided him with the "full and fair review" to which he is entitled. Aetna failed to substantively respond to the issues presented in Alan's appeals and did not meaningfully address the arguments or concerns that he raised during the appeals process.

57. Aetna, as the agent of the Plan, breached its fiduciary duties to Plaintiff3 when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in J.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Alan's claims.

58. The actions of Aetna and the Plan in failing to properly process and pay the Fulshear claims and to provide coverage for J.'s medically necessary FTT treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

59. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

60. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

61. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

62. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

63. The explicit language of the SPD, one of the governing plan documents, states that the Defendants will utilize broadly accepted medical standards in evaluating the medical necessity of treatment for purposes of evaluating coverage under the Plan of both

mental health, substance use, medical, and surgical claims.

64. The medical necessity criteria for sub-acute, or intermediate, inpatient mental health and substance use disorder treatment Aetna applied were more stringent or restrictive than the medical necessity criteria the Plan applied to sub-acute or intermediate level medical or surgical benefits.

65. Specifically, while the medical criteria applied to intermediate medical and surgical care are consistent with broadly accepted standards of care for treatment of certain medical and surgical disorders following hospital discharge but before a patient is able to return home, the criteria applied by the Plan to treatment of mental health and substance use disorders imposes requirements beyond broadly accepted medical standards; i.e., the utilization of standards for inpatient hospitalization to conditions where the medically appropriate level of care is in an intermediate care facility.

66. In addition, the level of care applied by Aetna failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Broadly accepted medical standards for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

67. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits Aetna, as agent for the Plan, excluded for J.'s treatment include sub-acute, or intermediate, inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of sub-acute inpatient

13
Case 3:20-cv-00441-RJC-DSC   Document 2   Filed 04/30/20   Page 13 of 17

treatment does the Plan exclude or restrict coverage of medical/surgical conditions by requiring patients to satisfy the medical necessity criteria for acute inpatient treatment. If it did so, the Plan would be violating the requirements of the SPD requiring that medical necessity be evaluating based on "broadly accepted medical standards."

68. In its review of J.'s claims from FTT, Aetna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that J. received. Aetna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Aetna's April 30, 2019, denial letter that J. "denied suicidal and homicidal ideation, did not evidence psychotic thought processing, nor exhibit mania or severe incapacitating depression, and she was not violent or otherwise aggressive towards others and destructive of property." In fact, none of these reasons for denying coverage in sub-acute, intermediate level inpatient treatment accord with "broadly accepted medical standards" as required by the SPD. If J. had been a threat to herself or others, psychotic, incapacitated with depression, violent, or destructive of property, she would have required acute inpatient treatment and would not have properly cared for at a sub-acute inpatient level of care.

69. Based on the SPD language, when the Plan receives claims for intermediate level treatment of medical and surgical conditions, it provides benefits and pays the claims as outlined in the terms of the Plan and based on, among other things, broadly accepted medical standards. But the imposition of requirements for coverage of the treatment at FTT that go beyond established standards of medical care for behavioral health treatment render the Plan's coverage for mental health and substance use disorder treatment inferior to the coverage it provides for analogous medical and surgical

treatment.

70. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates broadly accepted medical standards. They must and do acknowledge that they adhere to broadly accepted medical standards when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

71. The Plan's use or application of acute inpatient medical necessity criteria in evaluating the medical necessity of J.'s sub-acute inpatient treatment resulted in a disparity of coverage between mental health/substance abuse treatment and medical/surgical treatment because the Plan denied coverage for mental health and substance use disorder benefits while at the same time evaluating the medical necessity of analogous levels of medical or surgical care under broadly accepted medical standards. Had the Defendants complied with those standards when it evaluated J.'s mental health and substance use disorders, benefits would have been paid for the treatment at FTT.

72. In this manner, the Defendants' actions violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, or standards that limit the coverage for the FTT treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, or standards the Plan uses to limit coverage for medical/surgical treatment such as skilled nursing and inpatient rehabilitation treatment.

73. Aetna and the Plan did not produce the documents Alan requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity

Alan's allegations that Aetna and the Plan were not in compliance with MHPAEA in violation of 29 U.S.C. § 1133, its corresponding claim regulation, 29 C.F.R. § 2560.501-1, and the final rule for MHPAEA, 29 C.F.R. § 2590.712(d)

74. The violations of MHPAEA by Aetna and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and Aetna insured and administered plans as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their

loss arising out of the Defendants' violation of MHPAEA.

2. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for J.'s medically necessary treatment at Fulshear and FTT under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in the Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day April, 2020.

By   s/ Brian S. King
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Nassau County, New York