UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00441-RJC-DSC

| | | |
|---|---|---|
| ALAN R. | ) | |
| J. R., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | <u>Order</u> |
| | ) | |
| **BANK OF AMERICA GROUP BENEFITS** | ) | |
| **PROGRAM** | ) | |
| **AETNA LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment ("Defendants' Motion") (Doc. No. 29) and Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") (Doc. No. 31).  For the reasons stated herein, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** and Plaintiffs' Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**

    **A. Factual Background**

        1.    <u>The Plan</u>

Plaintiff Alan R. was a participant in a self-funded benefits plan qualified under the Employee Retirement Security Act ("ERISA") through Defendant Bank of America Group Benefits Program (the "Plan").  (Doc. No. 2 ¶ 3; Doc. No. 13 ¶ 3).  Defendant Aetna Insurance Company acted as the claim administrator for the Plan during the relevant time period ("Aetna").  (Doc. No, 2 ¶ 2; Doc. No. 13, ¶ 2).  Plaintiff J.R. is Alan R.'s daughter, who, at the relevant time, was a beneficiary of the Plan.  (Doc. No. 2 ¶ 1).  The Plan covers medically necessary services and

supplies, as defined in the Plan, for mental health including residential treatment. (Doc. No. 33-1 at 49, 59).

2.  Fulshear Ranch

J.R. has a history of mental health disorders and substance abuse. Prior to 2018, she was diagnosed with borderline personality disorder, dependent personality disorder, avoidant personality disorder, persistent depressive disorder, otherwise specified neurodevelopmental disorder, obsessive compulsive disorder, body dysmorphic disorder, trichotillomania, excoriation (skin picking), cannabis use disorder (mild), and eating disorder (NOS). (Doc. 33-2 at 279-80). She also abused substances including marijuana and cocaine. (*Id.* at 250, 282).

In March 2018, J.R. was admitted to the Fulshear Ranch, a licensed residential treatment facility located in Texas, which provides sub-acute inpatient treatment to young adult women with mental health, behavioral, and/or substance abuse problems. (*Id.* at 272-282; Doc. No. 2 ¶ 4; ). Soon after her admission, Aetna received claims for coverage of J.R.'s treatment at Fulshear Ranch and approved coverage for the first 10 days of treatment. (Doc. No. 33-1 at 362-66). Aetna denied payment of J.R.'s treatment at Fulshear Ranch after 10 days. (*Id.* at 362-66). It concluded that the treatment was not medically necessary and J.R. could be adequately treated at a lower level of care, applying its Level of Care Assessment Tool ("LOCAT"). (*Id.* at 362-66). Alan R. appealed the denial of benefits for services at Fulshear Ranch after 10 days, asserting the treatment was medically necessary. (Doc. No. 33-2 at 406-432). Aetna upheld its denial of benefits beyond 10 days as not medically necessary. (*Id.* at 310-327).

Next, Alan R. requested an external review of Aetna's denial by an independent review organization. (*Id.* at 353, 357-385). An independent reviewer at Medical Care Management Corporation ("MCMC Independent Reviewer") completed an independent review and concluded

that J.R.'s treatment at Fulshear Ranch was medically necessary through August 1, 2018, when she graduated from Fulshear Ranch. (*Id.* at 336-344). Therefore, Aetna's denial of coverage was overturned and Aetna reprocessed the claims for payment for J.R.'s treatment at Fulshear Ranch through August 1, 2018. (*Id.* at 332-33, 337).

As a result, Aetna made certain payments, discussed in more detail in Section III.A.2., for J.R.'s treatment at Fulshear Ranch. However, Alan R. disputed how the claims were processed and paid because the rates of reimbursement were not consistent from month to month. (Doc. No. 56-3 at 18-20). Aetna upheld its payment amounts. (*Id.* at 3-7).

### 3. Fulshear Transition

By August 1, 2018, J.R. completed her time at the Fulshear Ranch and moved to a related transitional living program meant to assist patients as they move to more independent living ("Fulshear Transition"). (Doc. No. 33-1 at 411). She remained at Fulshear Transition through the end of November 2018. (Doc. No. 47-4 at 453-465). While at Fulshear Transition, medical records reflect that J.R. continued to struggle with her mental health, including continued mood dysregulation, mentions of attempted or threatened suicide, being required to return to Fulshear Ranch on multiple occasions, and being fired from her job "due to not being able to meet independent working standards." (*Id.* at 471).

Aetna denied coverage of J.R.'s stay at Fulshear Transition, which Alan R. appealed and submitted J.R.'s medical records and letters from numerous of J.R.'s treating physicians stating Fulshear Transition was medically necessary. (Doc. No. 56-4 at 88; Doc. No. 47-4 at 5-24). Aetna maintained its denial of coverage after a medical director at Aetna concluded that outpatient care, not inpatient residential treatment, was the medically necessary level of care. (Doc. No. 48-2 at 128-46). It reasoned J.R. did not have suicidal or homicidal issues, there was no indication J.R.

was unable to adequately perform the activities of daily living, and no evidence her symptoms required the intensity of supervision and clinical management provided at the inpatient residential level of care.  (*Id.*).

Alan R. again requested an independent review of the denial of coverage of J.R.'s treatment at Fulshear Transition.  (*Id.* at 175-76).  An independent reviewer with Independent Medical Expert Consulting Services completed an independent review (the "IMEDECS Independent Reviewer"). and concluded that J.R.'s treatment at Fulshear Transition was not medically necessary.  (*Id.* at 147-164).  Applying LOCAT, the IMEDECS Independent Reviewer noted that during J.R.'s time at Fulshear Transition, she continued to display active symptoms of mood and personality and other disorders that required the continued structure and intensity of services, but she did not require inpatient residential care and could have been treated in a less restrictive setting.  (*Id.* at 157-164).  Based on the IMEDECS Independent Reviewer's assessment, Aetna upheld its decision to deny coverage of J.R.'s treatment at Fulshear Transition.  (*Id.* at 153-54).

### B.  Procedural Background

Plaintiff's filed this action in the District of Utah in April 2020.  The case was transferred to this District in August 2020.  The Complaint brings claims for (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B); and (2) violation of the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), seeking equitable relief under 29 U.S.C. § 1132(a)(3).  The parties filed cross-motions for summary judgment on August 30, 2021.  The Court heard oral arguments on the motions on December 15, 2021.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

4

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

5

"ERISA actions are usually adjudicated on summary judgment rather than trial." *Vincent v. Lucent Technologies, Inc*., 733 F. Supp. 2d 729, 733–34 (W.D.N.C. 2010) (citing *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir. 2009)).

## III. DISCUSSION

### A. Recovery of Benefits - § 1132(a)(1)(B)

"ERISA is a 'comprehensive' and 'closely integrated regulatory system' that is 'designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Gresham v. Lumbermen's Mut. Cas. Co*., 404 F.3d 253, 257–58 (4th Cir. 2005) (quoting *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 137 (1990)). A participant or beneficiary of a plan covered under ERISA may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

#### 1. Standard of Review for Denial of ERISA Benefits

When reviewing a denial of benefits under ERISA, the Supreme Court established in *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101 (1989), "that the default standard of review is de novo, and that an abuse-of-discretion review is appropriate only when discretion is vested in the plan administrator." *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008). Thus, "[i]n reviewing the denial of benefits under an ERISA plan, a court's first task is to consider de novo whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination." *Id.* at 321-22. If a plan "confers discretion on a fiduciary and the fiduciary acts within the scope of conferred discretion, [courts] defer to the fiduciary in accordance with well-settled principles of trust law . . . ." *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000) (citing

6

*Firestone*, 489 U.S. at 111). An ERISA plan can confer discretion in two ways, (1) by language that "expressly creates discretionary authority," or (2) by terms which "create discretion by implication." *Woods*, 528 F.3d at 322. Either way, the plan must "manifest a clear intent to confer such discretion." *Id.* Any ambiguity should be construed against the drafter of the plan and in accordance with reasonable expectations of the insured. *Id.*

Here, discretionary authority to determine claim coverage was allocated to Aetna under the Plan, which provides Aetna with "discretionary authority to determine eligibility for benefits and construe the terms of the applicable component plan and resolve all questions relating to claims for benefits under the component plan." (Doc. No. 33-1 at 218). Plaintiffs do not dispute that the Plan allocates discretionary authority to Aetna. Furthermore, there are no allegations that Aetna acted outside the scope of its discretion. Therefore, Aetna's decision will be reviewed under an abuse of discretion standard.

Under an abuse of discretion standard, a plan administrator's decision must be reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995). An administrator's decision is reasonable if it is "the result of deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Where the decision is reasonable, it should not be disturbed by a court reviewing that decision for abuse of discretion. *Id.* "Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a reasoning mind would accept as sufficient to support a particular conclusion." *Donnell v. Metro. Life Ins. Co.*, 165 Fed. App'x 288, 295 (4th Cir. 2006) (quotation marks omitted). Even if the Court would have come to a different conclusion independently, the Court will not reverse the plan administrator's decision if it is reasonable. *Booth*, 201 F.3d at 344.

7

The Fourth Circuit identified the following eight nonexclusive factors, known as the *Booth* factors, that courts consider in determining if an administrator's decision is reasonable:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d 335, 342-43 (4th Cir. 2000); *Champion v. Black & Decker (U.S.), Inc.,* 550 F.3d 353, 359 (4th Cir. 2008) (quoting *Booth*, 201 F.3d at 342-43). All eight *Booth* factors may not be relevant in a given case. *Helton v. AT&T, Inc*., 709 F.3d 343, 357 (4th Cir. 2013). In applying the *Booth* factors, the court does not weigh the evidence in the administrative record but, rather, reviews it to confirm that the claim decision was the product of a principled, reasoned decision-making process supported by substantial evidence. *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622 (4th Cir. 2010). If so, the claim determination will be upheld. *Id.*

### 2. Whether Aetna Abused its Discretion

#### a. *Payments Made to Fulshear Ranch*

After the MCMC Independent Reviewer's conclusion, the parties do not dispute that J.R.'s treatment at Fulshear Ranch is covered by the Plan. However, Plaintiffs dispute the amounts paid because they are inconsistent and not in accordance with the Plan terms. Additionally, they assert Aetna should have paid at least 60% of the total claims, not the allowed amount, for each month, but did not. Plus, Plaintiffs argue all charges should have been paid at 100% for J.R.'s treatment at Fulshear Ranch, after they met the deductible and reached out-of-pocket maximum. Defendants argue the payments for J.R.'s treatment at Fulshear Ranch were made in accordance with the Plan

terms since Fulshear Ranch is an out-of-network provider. According to Defendants, the Plan only pays 60% of the "allowed amount," as determined by Aetna in its discretion, after deduction, co-insurance, and precertification penalty. Then, after Plaintiffs met their out-of-pocket maximum, the Plan paid 100% of the allowed amount, and Plaintiffs are responsible for any billed amount in excess of the allowed amounts.

According to the Plan, an in-network or participating provider is one that has agreed to participate in the Plan's network of providers and to accept negotiated rates in full for services rendered to persons covered by the Plan. (Doc. No. 33-1 at 41). When covered persons use a provider that has not agreed to participate in the Plan's network, known as an out-of-network provider, the Plan will pay for the "allowed amount" of any covered out-of-network services. (Doc. No. 33-1 at 41). The Plan defines "allowed amount" as the negotiated rates or fees set each year by the Plan with its providers, and is the most the Plan will pay for covered services. (Doc. No. 33-1 at 42). If an out-of-network provider charges more than the allowed amount, the covered person is responsible for paying any amount over the allowed amount.[1] (Doc. No. 33-1 at 41-42). The Plan provides Aetna discretion to determine the "reasonable and customary" amount as the normal, or acceptable, range of payment for a specific health-related service or medical procedure, which depends in part on the location in which service is provided. (Doc. No. 33-1 at 42). The Plan pays "60% of covered services after deductible" for out-of-network residential treatment until the individual out-of-pocket maximum, discussed below, is met.[2] (Doc. No. 33-1 at 238).

---

[1] The Plan provides the following example: if an out-of-network hospital bill is $1,500 for an overnight stay and the allowed amount is $1,000, the person covered by the Plan may have to pay the $500 difference.

[2] Covered services are those services that are medically necessary. (Doc. No. 33-1 at 50).

9

Before the Plan pays most benefits, covered persons must meet their deductible, a fixed dollar amount they must pay for covered medical services each calendar year. (Doc. No. 33-1 at 44-45). After that, the covered person pays coinsurance, their percentage of responsibility for the covered service, until the person meets the out-of-pocket maximum. (Doc. No. 33-1 at 44-45). The out-of-pocket maximum is the most a covered person will pay for covered medical expenses in a calendar year. (*Id.*). Once a covered person meets the individual annual out-of-pocket maximum then 100% of eligible costs for that person are covered for the remainder of the year, and when two or more people combine to reach the family out-of-pocket maximum then 100% of eligible costs for everyone covered by the Plan are covered for the remainder of the year. (Doc. No. 33-1 at 327). The out-of-pocket maximum does not include "[e]xpenses above allowed limits." (Doc No. 33-1 at 44). The Plan also requires precertification before receiving certain services, including out-of-network residential treatment centers. (Doc. No. 33-1 at 47-49). Failure to obtain precertification for out-of-network residential treatment centers results in a $500 penalty of covered expenses. (Doc. No. 33-1 at 49).

Aetna made the following payments, relevant for purposes of Plaintiffs' claims, for J.R.'s treatment at Fulshear Ranch, an out-of-network provider, in the order of the timing in which the claims were processed according to Aetna:

| Dates of Service (2018)[3] | Billed Amount | Aetna Allowed Amount | Aetna Paid | Coinsurance Amount[4] | Aetna's Explanation for Allowed Amount Calculation |
|---|---|---|---|---|---|
| **August 1** | $526 | $263 | $157.80 | $105.20 | 50% of billed amount |
| **July 1-31** | $16,306 | $8,153 | $5,602.23 | $2,550.77 | 50% of billed amount |
| **April 1-30** | $15,780 | $6,122.64 | $6,122.64 | $0 | Multiplied the billed charges times the Medicare cost to charge ratio of .1940, and applied a 200% markup to account for profits ($15,780 x .1940 x 200%) |
| **June 1-30** | $15,780 | $3,479.72 | $3,479.72 | $0 | Multiplied the billed charges times the Medicare cost to charge ratio of .1940, and applied a 130% markup to account for profits ($15,780 x .1940 x 130%); then, reduced benefit by $500 for failure to follow precertification procedures |
| **May 1-31** | $16,306 | $8,153 | $8,153.00 | $0 | 50% of billed amount |

ERISA plans are contractual documents that should be interpreted in accordance with the general principles of contract and trust law. *Johnson v. American United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013). "A paramount principle of contract law requires us to enforce the terms of an ERISA insurance plan according to the plan's plain language in its ordinary sense, that is, according to the literal and natural meaning of the Plan's language." *Id.* at 819-20 (internal quotation and citations omitted). Additionally, the plans must be construed as a whole and seeking to give effect to every provision in the plan, "avoiding any interpretation that renders a particular

---

[3] (Doc. No. 56-4 at 10, 17, 34, 50, 59, 67).

[4] The Plan explains coinsurance as "your share of the costs of a covered service, calculated as a percentage of the allowed amount for the service. For example, if the plan's allowed amount for an overnight hospital stay is $1,000, your coinsurance payment of 20% would be $200. Your share of the cost may be higher if you haven't met your deductible."

provision superfluous or meaningless." *Id.* at 820. When interpreting an ERISA plan, the inquiry is what a reasonable person in the position of the participant would have understood the terms to mean. *Id.*

Here, the Plan's plain language states that "[t]he allowed amount is the most the [P]lan will pay for any covered out-of-network . . . services" and the covered person is responsible for anything over that allowed amount. (Doc No. 33-1 at 41-42). Similarly, the Plan states that "[e]xpenses above allowed limits" are excluded from the out-of-pocket maximum. *Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445, 449-50 (8th Cir. 2011) (concluding based on totality of plan language out-of-pocket was specifically defined not to include out-of-network charges above the out-of-network rate). Plaintiffs' argument that the Plan should cover the billed amount of the claims or 100% of the claims after J.R. met her out-of-pocket maximum would require the Court to interpret the Plan in a way that rendered important provisions meaningless, for example, that the Plan only covers the allowed amount for out-of-network providers. Therefore, based on the language of the Plan as a whole, the Court agrees with Defendants that the claims for J.R.'s treatment at Fulshear Ranch should be paid at 60% of the allowed amount, not the billed amount, until the out-of-pocket maximum was met and then paid at 100% of the allowed amount, not the billed amount.

However, the Court concludes Aetna did not make reasoned and principled decisions as to how much to cover for the claims from month to month, and abused its discretion when it determined the allowed amount each month differently, for seemingly the same services at Fulshear Ranch. For the months of July and May 2018, Aetna determined the allowed amount for services at Fulshear Ranch was 50% of the billed amount. However, in April and June 2018, for the same services at Fulshear Ranch, Aetna determined the allowed amount based on Medicare's

cost to charge ratio. And even still, between April and June 2018, under this cost to charge ratio determination, Aetna applied a different percentage for the profit markup between the months (200% in April 2018 and 130% in June 2018). Next, despite Plaintiff's appeal and request for explanation of the discrepancies in payment amounts Aetna failed to provide an explanation for the discrepancies. Instead, Aetna upheld the payment amount each month and explained generally how it calculated the allowed amounts, but not why the discrepancy from month to month existed. For these reasons, Aetna abused its discretion when determining the payment amounts for J.R.'s time at Fulshear Ranch.

### b. Denial of Coverage for Fulshear Transition

Plaintiffs argue Aetna abused its discretion when it denied coverage for J.R.'s time at Fulshear Transition. The ultimate question, and the parties' arguments for all but one relevant *Booth* factor, hinges on whether J.R.'s treatment at Fulshear Transition was medically necessary as defined by the Plan. (Doc. No. 48-2 at 162).

The Plan covers "medically necessary" services and supplies, defined as:

services or supplies provided by a hospital, physician, practitioner or other provider that are determined by your medical plan to be:
- Consistent with broadly accepted medical standards in the U.S. as essential to the evaluation and treatment of disease or injury and professionally recognized as effective, appropriate and essential based on recognized standards of the health care specialty
- Not furnished primarily for the convenience of the patient, the attending physician or other provider
- Furnished at the most appropriate level that can be provided safely and effectively to the patient
- Likely to produce a significant positive outcome, and no more likely to produce a negative outcome than any alternative service or supplies, as it relates to both the disease or injury involved and your overall health condition
- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease

13

(Doc. No. 33-1 at 49, 80).

Aetna uses guidelines in LOCAT when evaluating the medically necessary level of treatment for mental health care. (Doc. No. 57-2 at 1-3). LOCAT categorizes levels of treatment available for mental health from least restrictive to most restrictive as follows: outpatient or intensive outpatient program, partial hospitalization, residential treatment center, and inpatient program. (*Id.* at 4-5). LOCAT relies on six "dimensions" or factors for admission to mental health treatment which are: acute dangerousness, functional impairment, mental status and co-occurring conditions, psychosocial factors, additional modifiers, and global indicators. (*Id.* at 7-8, 16). For each dimension, the LOCAT describes symptoms within that dimension at increasing levels of seriousness, and for each of those, provides the medically necessary type of treatment. (*Id.* at 9-16). For purposes of determining coverage here, Aetna applied the LOCAT and considered J.R.'s treatment at Fulshear Transition as a residential treatment center.

Aetna denied coverage at Fulshear Transition because the treatment was not medically necessary under the Plan. Plaintiffs appealed and Aetna upheld its decision to deny coverage. In its denial letter, Aetna reasoned:

> There was no indication [J.R.] was unable to adequately perform activities of daily living. There was no reported evidence that her symptoms continued to require the intensity of supervision and clinical management provided at a residential level of care. There is no indication that after several months of highly structured treatment, further treatment in a structured program was medically necessary.

(Doc. No. 48-2 at 132). The denial letter concluded that the LOCAT guidelines did not support residential treatment and supported "routine outpatient level of care." (*Id.*).

Next, the IMEDEC Independent Reviewer completed a review of J.R.'s history and acknowledged that J.R. "continued to display active symptoms of mood and personality and other mental disorders that did require the continued structure and intensity of services," but concluded

14

the treatment was not medically necessary because she could have "been provided intensive, evidence-based treatments for her psychiatric disorders in a less restrictive setting." (Doc. No. 48-2 at 162). The IMEDEC Independent Reviewer reasoned that "[t]here were no severe psychiatric symptoms that required residential level structure or monitoring and the residual functional impairment in this case had improved with the residential treatments such that the patient could have been safely and effectively treated with lower level care," and "there were no remaining safety concerns with regard to risk of aggressive behaviors and no severe symptoms of the mood or substance use disorders that would have required continued and extended residential level care." (Doc. No. 48-2 at 162).

Plaintiffs generally make the same argument as to why each of the *Booth* factors weigh in their favor. They argue J.R.'s treatment at Fulshear Transition was medically necessary because the medical records reflect J.R. continued to have the same issues with her mental health after August 1, 2018, including mood dysregulation, attempted or threatened suicide, returning to Fulshear Ranch on multiple occasions because of her behaviors, and being fired from a job because she was unable to meet independent working standards. Plaintiffs assert that based on this evidence, which was in the medical record considered by Aetna, Aetna's LOCAT criteria which requires "[t]he covered level of care at the time of a Member's admission is the highest level of care recommended in any of the dimension" recommends residential treatment for J.R. (Doc. No. 57-2 at 7).

On the other hand, Defendants argue that a less restrictive level of care could be provided to J.R. at a lower cost; therefore, treatment at Fulshear Transition was not medically necessary as defined by the Plan. Defendants' response largely relies on the fact that Aetna's decision to deny coverage was reasonable when it relied on an in-house psychiatrists and an independent reviewer

psychiatrist who each concluded "J.R.'s treatment could have been safely and effectively provided at a lower level of care, such as partial hospitalization or intensive outpatient therapy," rather than residential treatment, which would have been less costly. Additionally, Defendants unpersuasively rely on the MCMC Independent Reviewer's statement that by August 1, 2018, J.R. had made the progress to benefit from treatment in a less structured and intense setting, when the MCMC Independent Reviewer was strictly reviewing whether J.R.'s stay at Fulshear Ranch was medically necessary through July 2018, and did not consider whether Fulshear Transition beginning in August 2018 was medically necessary.

Here, the majority of the *Booth* factors weigh in favor of Plaintiffs. Defendants take an all or nothing approach to covering J.R.'s treatment at Fulshear Transition, which the Court concludes is an abuse of discretion. Defendants agree that some level of treatment for J.R. was medically necessary but claim Fulshear Transition was not medically necessary because Aetna considered it a residential treatment facility for purposes of coverage and J.R. could have been provided treatment in a less restrictive setting. Thus, Aetna completely denied coverage for Fulshear Transition rather than providing coverage at a lesser amount. Additionally, Defendants on the one hand claim Fulshear Transition was not medically necessary because they considered it residential treatment for coverage purposes, but, on the other hand, they argue Fulshear Transition was a "stepped down," less restrictive treatment facility, not a residential treatment facility.[5] Defendants cannot have it both ways. All parties agree some level of mental health treatment was necessary for J.R. Fulshear Transition was less restrictive treatment than Fulshear Ranch. Therefore, it

---

[5] Indeed, Defendants' counsel stated during oral arguments that if J.R.'s claims for her time at Fulshear Treatment had been billed differently to Aetna, for something less restrictive than residential treatment, then the claims would have been processed and paid for by the Plan.

16

appears to the Court the treatment at Fulshear Transition, a less restrictive treatment, was the type of treatment that was medically necessary for J.R.

1) *Booth* Factors 1 to 4: Language and purpose of the Plan; adequacy of materials considered and degree to which they support the decision; and whether interpretation was consistent with other provisions of the Plan and earlier interpretations of the Plan

The language and purpose of the Plan is to cover "medically necessary" services and supplies. As discussed above, Fulshear Transition provided a less restrictive level of care which at some level all parties agree was medically necessary for J.R. Additionally, J.R.'s medical records indicate at least two instances in which J.R. attempted or threatened suicide, that J.R. was fired from her job due to her behavior, and J.R. was required on multiple occasions to return to Fulshear Ranch, for more restrictive supervision, because of her continued behaviors caused by her mental health disorders. J.R.'s treating physicians also believed the treatment was medically necessary for J.R. Based on this information, the Court concludes treatment at Fulshear Transition was medically necessary for J.R. Thus, factors one to four weigh in favor of Plaintiffs since Defendants denied coverage because Aetna determined treatment at Fulshear Transition was not medically necessary.

2) *Booth* Factor 5 to 7: Whether the decision making process was reasoned and principled; whether the decision was consistent with the procedural and substantive requirements of ERISA; and any external standard relevant to the exercise of discretion

Similarly, Defendants' all or nothing approach was not a reasoned and principled decision making process and not a full and fair review. As discussed above, Aetna fully denied coverage, rather than providing partial coverage, while also admitting J.R. needed some level of coverage. And Defendants take inconsistent positions about the level of treatment J.R. received at Fulshear Transition depending on whether the position assists their position that coverage is not necessary

17

at the time. Therefore, factors five and six weigh in favor of Plaintiffs. The parties agree the seventh factor is not relevant in this case.

3) *Booth* Factor 8: Conflict of Interest

The eighth factor does not weigh in favor of either party. The usual structural conflict of interest in which the plan administrator is also the insurer does not exist here. Aetna is responsible for making decisions about whether benefits should be paid, but since the Plan is self-funded, Aetna is not responsible for paying those benefits. Plaintiffs argue Aetna had a conflict of interest because "the very act of interpreting medical policies in ways that violate recognized standards of care, has the effect of lowering plan administration and outlay costs, making Aetna more attractive and marketable as a contracted claims reviewer to self-funded plans." *Wit v. United Behavioral Health*, No. 14-cv-05337 JCS, 2019 U.S. Dist. LEXIS 35205, at *210 (N.D. Cal. Feb. 28, 2019) (concluding conflict of interest existed in part because administrator "felt pressure to keep benefit expenses down so that it could offer competitive rates to employers."). However, Plaintiffs have not presented any evidence to show how that is the case here. In any event, a Plan administrator's conflict of interest should be viewed "as but one factor among the many identified in *Booth* for reviewing the reasonableness of a plan administrator's discretionary decision" and since the Court concludes for the reasons above Aetna abused its discretion this factor is ultimately not relevant to the Court's decision. *Thomas v. United of Omaha Life Ins. Co.*, 536 Fed. App'x 347, 351 (4th Cir. 2013).

c. <u>Remedy</u>

Generally, remand is appropriate when a plan administrator's decision is overturned. *See Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995) ("The administration of benefit and pension plans should be the function of the designated fiduciaries, not the federal courts.");

18

*Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co*., 32 F.3d 120, 125 (4th Cir. 1994). But, "remand is not required, particularly in cases in which evidence shows that the administrator abused its discretion." *Helton v. AT&T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013); ("[W]hen the trustees have demonstrated a manifest unwillingness to give fair consideration to evidence that supports the claimant, the claim should not be returned to the trustees."). It is within the district court's discretion whether to remand to a plan administrator or award benefits, and it "require[s] flexibility to augment records, as '[s]ome ERISA cases involve complex medical issues crucial to the interpretation and application of plan terms.'" *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 362 (4th Cir. 2008) (quoting *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993)).

The Court will remand this matter to Aetna to determine the allowed amount to be paid for J.R.'s time at both Fulshear Ranch and Fulshear Transition. As discussed above, the Court agrees with Defendants that the Plan does not cover the total billed amount, but rather the allowed amount, of out-of-network claims. Neither party submitted evidence of the reasonable and customary amounts for the services provided to J.R. at both facilities. Additionally, the Plan provides Aetna with discretion to determine the reasonable and customary amount for services. The Court directs that the allowed amount be determined based on a reasoned and principled decision making process, including consistency as to how that amount is determined for the same or similar treatment. The Court will retain jurisdiction to consider objections to how the allowed amount was determined, which must be filed within thirty (30) days after such a determination is provided to the Plaintiffs.

d. Attorneys' Fees

19

Pursuant to 29 U.S.C. § 1132(g), the Court, in its discretion, may allow reasonable attorneys' fees and costs to either party. In the Fourth Circuit, the party requesting attorneys' fees under section 1132(g) should achieve "some degree of success on the merits." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634 (4th Cir. 2010) (quoting *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242 (2010) (quotation marks omitted).

Plaintiffs' Motion requests the Court set a deadline for filing a petition for payment of attorneys' fees supported by appropriate documentation following judgment in their favor, in "keeping with local practice." *See L.B. ex rel. Brock v. United Behavioral Health, Inc. Wells Fargo & Co. Health Plan*, 47 F. Supp. 3d 349, 360-61 (W.D.N.C. Sept. 16, 2014) (ordering plaintiff to file motion for attorney's fees with proper briefing and evidence within fourteen days of summary judgment in plaintiff's favor); *Millage v. B.V. Hedrick Gravel & Sand Co. Employee Ben. Plan*, No. 3:10cv140, 2011 WL 4595999 (W.D.N.C. Sept. 30, 2011) (requiring plaintiff to file motion for attorney's fees separately pursuant to Fed. R. Civ. P. 54(d)). Plaintiffs shall have fourteen (14) days from entry of the Order to file a motion for attorneys' fees and Local Rule 7.1 shall govern the time for filing responses and replies thereafter.

**B. Mental Health Parity and Addiction Equity Act of 2008**

The Parity Act was enacted "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). The Parity Act targets and prohibits specific unequal financial requirements and treatment limitations. *Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209 (D. Utah 2019) (citing 29 U.S.C. §§ 1185a(a)(3)(A)(ii)–(B)(iii)). Where a group health plan provides both medical and surgical benefits and mental health/substance use

disorder benefits, the law requires that: (1) the "financial requirements"[6] and "treatment limitations" applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant financial requirements or treatment limitations applied to substantially all medical and surgical benefits, and (2) there are no separate cost sharing requirements or treatment limitations that are applicable only to mental health or substance use disorder benefits. 29 U.S.C. § 1185a(a)(3)(A); *Michael M. v. Nexsen Pruet Group Med. & Dental Plan*, No. 3:18-cv-00873, 2021 WL 1026383, at *10 (D.S.C. Mar. 21, 2021).

Of relevance here, the term "treatment limitation" includes limits on benefits based on the frequency of treatment, number of visits, days of coverage, days in a waiting period, or other similar limits on the scope or duration of treatment. 29 U.S.C. § 1185a(a)(3)(B)(iii); 29 C.F.R. § 2590.712(a). Treatment limitations include both quantitative treatment limitations, which are expressed numerically (for example, 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage. 29 C.F.R. § 2590.712(a). "Nonquantitative treatment limitations on mental health benefits include '[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness' and '[r]efusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols).'" *Christine S.*, 428 F. Supp. 3d at 1219 (quoting 29 C.F.R. § 2590.712(c)(4)(ii)).

The Parity Act prohibits more restrictive treatment limitations as written and as applied. 29 C.F.R. § 2590.712. Thus, plaintiffs can allege violations of the Parity Act by asserting (1) a facial challenge alleging that the terms of a plan discriminate against mental health and substance

---

[6] Financial requirement includes deductibles, copayments, coinsurance, and out-of-pocket expenses, but excludes an aggregate lifetime limit and an annual limit subject to exceptions. 29 U.S.C. §1185a(a)(3)(B)(i).

abuse treatments in comparison to medical or surgical treatment, and (2) an as-applied challenge by alleging that the same nonquantitative treatment limitations are applied more stringently to mental health and substance use disorder benefits. *Michael M.*, 2021 WL 1026383, at *10. Here, Plaintiffs allege an as-applied violation, specifically as to how Aetna applied the LOCAT when it evaluated benefits for mental health and substance use disorder claims.

The Supreme Court and Fourth Circuit have provided guidance on the interplay between section 1132(a)(1)(B) and 1132(a)(3). In *Varity Corp. v. Howe*, the Supreme Court described section 1132(a)(3) as a "catchall" provision which acts as a "safety net" when ERISA does not elsewhere provide an adequate remedy at law such as the remedy available in section 1132(a)(1)(B). 516 U.S. 489, 512 (1996). In applying *Varity*, the Fourth Circuit concluded it is not appropriate for a plaintiff to bring a claim under section 1132(a)(3) seeking equitable relief if plaintiff's injury could be addressed by a claim under section 1132(a)(1)(B) for review of wrongful denial of benefits. *Korotynska v. Metropolitan Life Ins. Co.*, 474 F.3d 101 (4th Cir. 2006). Rather, "[i]ndividualized equitable relief under § 1132(a)(3) is normally appropriate only for injuries that do not find adequate redress in ERISA's other provisions." *Id.* at 102.

Since *Varity*, the Supreme Court in *CIGNA Corp. v. Amara*, concluded relief under section 1132(a)(3) was appropriate to provide equitable remedies, such as reformation of a contract, where remedies available under section 1132(a)(1)(B) were determined not to be available. 563 U.S. 421, 438-442 (2011). Some courts have looked to *Amara*, to conclude it is proper for plaintiffs to bring claims for both an award of benefits under section 1132(a)(1)(B) and equitable relief under 1132(a)(3). However, these courts generally acknowledge that together the Supreme Court's decisions "make clear that if the circumstances of a case indicate that a [section 1132(a)(1)(B)] remedy is or would be adequate to address the plaintiff's alleged injury, the court need not address

22

a remedy sought under [section 1132(a)(3)] for the same injury." *Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209, 1222 (D. Utah 2019).

Plaintiffs' Parity Act claim does appear to be a repackaged claim for the denial of benefits claim. Plaintiffs bring a claim under the Parity Act as an-applied violation which raises the same concerns as Plaintiffs' section 1132(a)(1)(B) claim that Aetna's decision to deny benefits because J.R.'s treatment was not medically necessary was the wrong decision. While the issue for Plaintiffs' Parity Act claim is whether Aetna applied the LOCAT more restrictively than the guidelines applied to certain medical and surgical conditions, it does not change the ultimate injury and intent of the claim which is the same as that raised in the section 1132(a)(1)(B) claim. However, the Court need not determine whether it was appropriate to bring both claims under *Korotynska.* Even if it was, because the Court is granting Plaintiffs' relief pursuant to section 1132(a)(1)(B), relief under section 1132(a)(3) for the same injury is not appropriate. Therefore, summary judgment in favor of Defendants is appropriate on Plaintiffs' Parity Act claim.

## IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 31) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is **GRANTED** as to Plaintiffs' claim for Recovery of Benefits under ERISA 29 U.S.C. § 1132(a)(1)(B) (Count I) and **DENIED** as to Plaintiffs' claim for violation of the Parity Act, seeking equitable relief under 29 U.S.C. § 1132(a)(3) (Count II);

2. Defendant's Motion for Summary Judgment (Doc. No. 29) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, it is **DENIED** as to Plaintiffs' claim for Recovery of Benefits under ERISA 29 U.S.C. § 1132(a)(1)(B) (Count I) and

**GRANTED** as to Plaintiffs' claim for violation of the Parity Act, seeking equitable relief under 29 U.S.C. § 1132(a)(3) (Count II);

3. Plaintiffs may file a motion for attorney's fees containing the arguments and evidence for the Court to more appropriately consider the request, within fourteen (14) days of this Order, and Local Rule 7.1 shall govern the time for filing responses and replies thereafter; and

4. This matter is **REMANDED** to Aetna to determine the allowed amount of coverage for J.R.'s treatment at Fulshear Ranch and Fulshear Transition consistent with the terms of this Order. The Court will retain jurisdiction to consider objections as to how the allowed amount was determined, which must be filed within thirty (30) days after such a determination is provided to the Plaintiffs.

Signed: February 9, 2022

Robert J. Conrad, Jr.
United States District Judge

24